UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARKETING DISPLAYS INTERNATIONAL,

          Plaintiff,

              v.

BRIANNA SHAW,

          Defendant.

_____/

Case No. 22-cv-12287

U.S. District Court Judge
Gershwin A. Drain

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF No. 3)

### I.  INTRODUCTION

On September 2, 2022, Plaintiff Marketing Displays International (MDI) filed a complaint against Defendant Brianna Shaw in the Oakland County Circuit Court alleging a single claim of breach of a non-competition agreement.  ECF No. 1-2, PageID.10–17.  Ms. Shaw timely removed the matter to this Court.  ECF No. 1.  Presently before the Court is Plaintiff's Motion for Preliminary Injunction. ECF No. 3.  The motion is fully briefed, *see* ECF Nos. 6, 7, and the Court held an evidentiary hearing on the matter on December 6, 2022.  For the following reasons the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction (ECF No. 3).

1

## II.  BACKGROUND

The Court gives a brief overview of the facts here, as they will be discussed in greater detail *infra*.

According to MDI President Lisa Sarkisian, "MDI is in the business of providing promotions and marketing products and services, including Point of Purchase ("POP") products and services to the retail and restaurant industries." ECF No. 3-1, PageID.92.  MDI offers its customers "design, engineering, prototyping, experiential, digital, production, logistics and fulfillment, warehousing, and installation" services. *Id*.

Ms. Shaw began her employment with MDI in July 2018. *Id.* Her role was POP Key Account Executive, in which she solicited and coordinated sales and potential sales with current and new customers. ECF No. 3, PageID.75.  Ms. Shaw was assigned to service MDI's customers in the southeastern United States, but she sometimes assisted in other regions. ECF No. 3-1, PageID.92.  As a condition of her employment, Ms. Shaw signed an Agreement on Non-Competition, Non-Disclosure and Property Rights ("Non-Competition Agreement" or "Agreement").  Ms. Shaw agreed, *inter alia*, that:

> During his or her employment, and for a period of one (1) year after termination of his or her employment, Employee shall not, in any manner, directly or indirectly, (a) be employed by, work or consult with, engage in or participate in the ownership, management, operation

2

or control of any Competing Entity that conducts its business within the Territory (as the terms "Competing Entity" and "Territory" are defined below); or (b) solicit or divert any business or any customer from MDI or assist any person, firm or corporation in doing so; or (c) cause or seek to cause or assist any person, firm or corporation to refrain from dealing or doing business with MDI; or (d) solicit or divert any employees from MDI or assist a person, firm or corporation in doing so. The term "Competing Entity" shall mean a business engaged in the design, manufacture or sale of products and/or services that are in competition with MDI. The term "Territory" shall mean the United States and any foreign country in which MDI does business.

ECF No. 3-3, PageID.101.  The Non-Competition Agreement also includes a non-disclosure provision and a provision concerning MDI's property rights in its "Confidential Information," as defined in the Agreement.  *Id.* at PageID.101–02.

On June 21, 2022, Ms. Shaw submitted her letter of resignation to MDI, and she left the company on July 1, 2022.  At some point, Ms. Shaw took employment with Miller Zell.  As discussed in Section III.B.1.i. *infra*, the Parties dispute the exact nature of Miller Zell's business as it relates to the POP industry.  Nevertheless, Ms. Shaw maintains that she "sells a completely different set of products" at Miller Zell than those sold at MDI.  ECF No. 6, PageID.156.  Specifically, she now sells "strategy, environmental design, permanent store fixtures, commercial printing services, and installation services."  ECF No. 6-2, PageID.176.  Miller Zell's Executive Vice President of Retail and Chief Financial Officer (CFO) David Seem

3

stated via affidavit that the business offers the following services: in-house printing, permanent signage, décor signage, environmental design, digital client solutions, strategy and prototyping, and in-house installation.  ECF No. 6-3, PageID.185.

Since leaving MDI, Ms. Shaw has communicated with MDI's existing customers via LinkedIn.  ECF No. 3-1, PageID.94.  She has also communicated with prospective customers that she and/or her former colleagues met during marketing events while Ms. Shaw worked at MDI.  *Id*.  During the evidentiary hearing Ms. Shaw testified that prior to receiving MDI's demand letter, she had had minimal contact with a few of MDI's existing or prospective customers and all of it was innocuous and unrelated to MDI's or Miller Zell's business.  Additionally, as discussed in Section III.B.1.i. *infra*, Ms. Shaw retains in her personal Google Drive account spreadsheets that she created while working at MDI which contain the names and contact information for customers that she and her former colleagues met at marketing events and trade shows.  Although she testified that she has not viewed the spreadsheets since her departure, Ms. Shaw has restricted access to them from current MDI employees to ensure she does not see any updates.

On July 25, 2022, MDI, through its counsel, sent Ms. Shaw a demand letter requiring her to discontinue her working relationship with Miller Zell and stop soliciting MDI customers pursuant to the Non-Competition Agreement.  ECF No. 3-

4

9.  The letter warned that MDI would pursue legal remedies if Ms. Shaw did not comply.  *Id*.  Ms. Shaw responded that she disputes the enforceability of the Agreement or that her employment with Miller Zell violates it, that she has not engaged in any direct or indirect efforts to solicit MDI's customers, and that she had not and would not use any of MDI's Confidential Information for the benefit of Miller Zell.  ECF No. 3-10.  She also, *inter alia*, stated that she was in possession of one USB drive that may contain information pertinent to MDI as well as her own personal information (in addition to the aforementioned spreadsheets in Google Drive) and was willing to develop a mutually agreeable plan for returning all of MDI's information.  ECF No. 3-10, PageID.129.

### III.   LAW & ANALYSIS

#### A. Legal Standard

"A preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (quoting *Hanson Trust PLC v. ML SCM Acquisition Inc.*, 781 F.2d 264, 273 (2d Cir. 1986)).  Whether to grant such relief is a matter within the discretion of the district court.  *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540–41

5

(6th Cir. 2007).  The Court must balance four factors in determining whether to grant a request for a preliminary injunction.  *Id*. at 542.  Those factors are:

> (1) whether the movant is likely to succeed on the merits;
> (2) whether the movant would suffer irreparable harm without the injunction;
> (3) whether the balance of the equities favor the movant; and
> (4) whether an injunction is in the public interest.

*See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  These considerations "are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224, 230 (6th Cir.2003) (quoting *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir.2001)).  "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

### B. Discussion

#### 1.  MDI is likely to succeed on the merits.

First, the Court must determine whether MDI has demonstrated a likelihood of success on the merits.  *See Winter*, 555 U.S. at 20.  Although MDI need not prove its case in full at this early stage in the proceedings, it must show more than a mere possibility of success.  *See Certified Restoration Dry Cleaning*, 511 F.3d at 543.

6

### i.   MDI will likely succeed in establishing that the Non-Competition Agreement is a valid contract.

The Parties agree that MDI's breach of contract claim is governed by Michigan law.  *See* ECF No. 3-3, PageID.102.  Although courts generally presume the enforceability of contracts, "noncompetition agreements are disfavored as restraints on commerce and are only enforceable to the extent they are reasonable." *Coates v. Bastian Bros., Inc.*, 276 Mich. App. 498, 507, 741 N.W.2d 539 (2007). The party seeking enforcement bears the burden of demonstrating the validity of the agreement.  *Id*.  Section 445.774a(1) of the Michigan Antitrust Reform Act provides:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business.  To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

MCL 445.774a(1).  "To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill."  *St. Clair Med., P.C. v. Borgiel*, 270 Mich. App. 260, 266, 715 N.W.2d 914 (2006).

7

The Court finds that the Non-Competition Agreement is reasonable.  For the reasons discussed in Section III.B.1.ii. *infra*, the Court concludes that the Non-Competition Agreement protects MDI's reasonable competitive business interests because Miller Zell qualifies as a Competing Entity under the Agreement. Additionally, the Agreement explicitly protects against the retention or disclosure of Confidential Information, including trade secrets and customer lists.  Thus, the Non-Competition Agreement protects against Ms. Shaw gaining an unfair advantage in competition with MDI without prohibiting her from using her general knowledge or skill.

Moreover, the Court finds the Non-Competition Agreement's one-year duration is "squarely within the allowable time span within Michigan" and thus reasonable. *Delphi Auto. PLC v. Absmeier*, 167 F. Supp. 3d 868, 881 (E.D. Mich. 2016), *modified,* No. 15-CV-13966, 2016 WL 1156741 (E.D. Mich. Mar. 24, 2016) (citing *Kelly Servs., Inc. v. Noretto*, 495 F.Supp.2d 645, 657 (E.D. Mich. 2007)). Further, the Court finds the Non-Competition Agreement's geographic limitation is "tailored so that the scope of the agreement is no greater than is reasonably necessary to protect [MDI's] legitimate business interests" given that Ms. Shaw worked with national and international brands while employed at MDI.  *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847 (E.D.Mich.1994); *see also Lowry Computer Prod.,*

8

*Inc. v. Head*, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997) ("[A]n unlimited geographical scope is reasonable if the plaintiff's business is sufficiently national and international in scope.").  Finally, the Court finds the type of employment prohibited is reasonable given that the Agreement only limits Ms. Shaw from working with Competing Entities, soliciting or diverting customers and employees from MDI, and causing others to refrain from dealing with MDI.

Accordingly, the Court concludes that the Non-Competition Agreement is enforceable under Michigan law.  As such, MDI is likely to succeed in establishing that the Non-Competition Agreement is a valid contract.

### ii.   MDI will likely succeed in showing that Ms. Shaw has breached the Non-Competition Agreement.

To succeed on its claim, MDI must also establish that Ms. Shaw breached the Non-Competition Agreement.  MDI alleges two theories of breach.

First, MDI asserts Ms. Shaw is currently violating her Non-Competition Agreement by working for Miller Zell, which qualifies as Competing Entity under the terms of the agreement.  ECF No. 3, PageID.82.  Specifically, it contends that it and Miller Zell "provide overlapping POP products and services to [] quick serve restaurant, retail[,] and commercial customers." *Id.* at PageID.77.  In support of its argument, MDI notes that, *inter alia*, *Creative Magazine*, a trade industry publication, listed both companies in its annual "The Top 50 P.O.P Companies" list

9

in its July/August 2022 issue;[1] the companies attend the same trade shows; both companies are members of the Retail Design Institute; and the companies describe themselves similarly online. *Id.* at PageID.78. Additionally, at the evidentiary hearing on the instant Motion, two MDI employees as well as MDI President Lisa Sarkisian testified that they consider MDI and Miller Zell competitors and that MDI offers many of the same products and services Miller Zell CFO David Seem stated that Miller Zell provides in his affidavit.

In contrast, Ms. Shaw asserts Miller Zell is not a Competing Entity because, unlike MDI which sells POP products, Miller Zell sells "strategy, environmental design, permanent store fixtures, commercial printing services, and installation services." ECF No. 6, PageID.156. Additionally, the *Creative Magazine* article describes the companies as providing different services,[2] the Retail Design Institute's membership represents a broad range of industries, and the Standard Industrial Classification Codes and North American Industry Classification System Codes for the companies are different. *Id.* at PageID.160–62. Moreover, at the

---

[1] In her Response, Ms. Shaw contended that the *Creative Magazine* article is inadmissible hearsay. ECF No. 6, PageID.165. However, at the evidentiary hearing, the parties stipulated that all exhibits attached to their briefs could be considered by the Court for the purposes of adjudicating the Motion.

[2] At the evidentiary hearing, Miller Zell CFO David Seem testified that Miller Zell's inclusion in the article was due to the mistake of a new marketing associate.

10

evidentiary hearing on the Motion, Defense Counsel introduced evidence that MDI changed its company description on its website shortly after Ms. Shaw's resignation and shortly before commencing the underlying state action, and several witnesses testified that Miller Zell does not manufacture anything and instead outsources any fixtures that are needed to effectuate its designs.[3]

Based on the foregoing and the other evidence introduced during the evidentiary hearing, the Court concludes that MDI is likely to succeed on the merits about whether Miller Zell is a Competing Entity. The Non-Competition Agreement defines a "Competing Entity" as "a business engaged in the design, manufacture or sale of products and/or services that are in competition with MDI." ECF No. 3-3, PageID.101. There was conflicting testimony at the evidentiary hearing about whether MDI engages in independent design work for its customers or implements designs that have already been developed or rendered. Regardless, there was sufficient evidence introduced that in the process of creating "branded design environments," Miller Zell also designs POP for, and/or provides POP to, its customers. Although Miller Zell does not manufacture this POP in-house, CFO David Seem testified that Miller Zell procures POP for its customers and provides it

---

[3] There was conflicting testimony about whether Miller Zell has contracted with MDI in the past, but several witnesses testified about negotiations between the companies to partner on projects.

11

to them as part of its services.   Notably, in its own Supplier Confidentiality Agreement, Miller Zell describes itself as being "in the business of providing certain design, print, project management, logistic, installation[,] and consulting services with respect to the design, advertising, store signage, *point of purchase*[,] and store fixture merchandise."[4]   Pl.'s Ex. 22 (emphasis added).   Even under the narrow definition of MDI's business that Ms. Shaw would have the Court adopt—as just a POP company, ECF No. 6, PageID.156—this would put Miller Zell in competition with MDI.

Thus, MDI will likely succeed in establishing Ms. Shaw breached the Non-Competition Agreement by taking employment with Miller Zell.

Second, MDI contends that Ms. Shaw is currently violating her Non-Competition Agreement by retaining MDI's Confidential Information.   ECF No. 3, PageID.82.   MDI alleges that shortly before her departure, Ms. Shaw accessed MDI's sales and customer information and saved data to a personal USB drive and a personal OneNote account.   *Id.* at PageID.80.   MDI also asserts that Ms. Shaw has retained spreadsheets containing confidential customer contact information that she learned at marketing events and shows.   *Id.*

---

[4] The Court also notes that "advertising, store signage, . . . and store fixture merchandise" could also be considered POP depending on their type.

12

Ms. Shaw responds that it was common practice for all employees to use their personal accounts and devices while conducting business on behalf of MDI whenever MDI's server was down, when traveling, or when customers required particular software. ECF No. 6, PageID.158–59. She contends that MDI leadership was aware of this practice, and it was not "nefarious." *Id.* at PageID.159. Notably, Ms. Shaw has not indicated whether she has returned the information she saved shortly before her departure, which the Court presumes is the same USB drive mentioned in her response to MDI's demand letter.

Additionally, during the evidentiary hearing, Ms. Shaw conceded that she still has the spreadsheets in her Google Drive account. There, and in her Response, she explained that MDI was aware that she had created the spreadsheets in her personal Google Drive account. ECF No. 6, PageID.159–60. She further explained that she removed MDI's access after her departure because she did not want to see any updates MDI employees might make to the spreadsheets. *Id.* Ms. Shaw asserted that she had not accessed the spreadsheets herself other than to change the access permissions and that she had not shared them with or disclosed them to anyone else. *Id.* She also testified that she was unable to return the spreadsheets earlier because she was between attorneys, but she is willing to have her attorney do so now. Finally, Ms. Shaw contended that the spreadsheets do not contain Confidential Information

13

because they only contain the names of companies and phone numbers for certain employees at those companies, all of which is publicly available.

The Non-Competition Agreement states that "Confidential Information" "may include production methods, shop practices, product composition, products, equipment, manufacturing, financial, marketing and sales information, computer programs and other documentation and information and other know-how, confidential information and trade secrets of MDI, its affiliates and other third parties." ECF No. 3-3, PageID.101. The Agreement goes on to state that "in the event of termination of employment, Employee shall deliver to MDI all property relating to the Confidential Information, including all magnetic tapes and disks, documents, data, client records or other materials, and *shall not retain* or allow third parties to retain photocopies or reproductions of such property." *Id.* (emphasis added).

To the extent Ms. Shaw has retained sales or more detailed customer information than publicly available names and phone numbers, such information qualifies as Confidential Information under the Non-Competition Agreement. Additionally, Ms. Shaw's argument regarding the customer names and contact information is unavailing. The list of examples of Confidential Information in the Non-Competition Agreement is not exhaustive, and Michigan law considers

14

customer lists confidential information which may be protected via a non-competition agreement. *See Certified Restoration Dry Cleaning*, 511 F.3d at 547 ("Reasonable covenants may protect such legitimate interests as trade secrets, confidential information, close contact with the employer's customers or customer lists, or cost factors and pricing."); *Lowry*, 984 F. Supp. at 1116 ("[I]t appears from the submissions of the parties that defendant must have at least some confidential information, in the form of customer lists, . . . .").

Additionally, the Court notes that MDI presented evidence during the Evidentiary Hearing that Ms. Shaw provided a list of her top ten customers while at MDI to a recruiter, who then provided this information to Miller Zell. Pl.'s Ex. 31. The Non-Competition Agreement provides that "[d]uring the term of his or her employment and after the termination of his or her employment for any reason, Employee shall not use or disclose to any other Confidential Information except to the extent necessary to function as an employee of MDI. ECF No. 3-3, PageID.101. Ms. Shaw testified that she provided the recruiter the list of customers to give him a sense of the market she worked in and that she did not realize he would provide the list to potential employers. However, given that providing the list to the recruiter was not "necessary to function as an employee of MDI," doing so still qualifies as a breach of the Non-Competition Agreement regardless of Ms. Shaw's intentions.

15

Thus, because Ms. Shaw has conceded that she sent her customer list to a recruiter and retained the USB drive and spreadsheets with customer information, MDI will likely succeed in establishing that she breached the Non-Competition Agreement by improperly disclosing and retaining Confidential Information.

Accordingly, this factor weighs in favor of granting a preliminary injunction.

## 2.  MDI would suffer irreparable harm without the injunction.

Second, the Court considers whether the movant will suffer irreparable harm in the absence of preliminary relief.  *See Winter*, 555 U.S. at 20.  Harm is not "irreparable" if it can be fully compensated by the payment of monetary damages. *Certified Restoration Dry Cleaning*, 511 F.3d at 550.  "In addition, the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir.1991).  Nevertheless, the Sixth Circuit has held that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute.  Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer."  *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir.1992) (citations omitted).

16

MDI argues that Ms. Shaw "established unique contacts, relationships, and goodwill with MDI's customers" in her role as a Key Account Executive.  ECF No. 7, PageID.222.  As such, MDI asserts that it will suffer irreparable injury without injunctive relief because Ms. Shaw "is causing the very loss of customer goodwill and future potential business opportunities found to constitute irreparable harm in *Basicomputer Corp*."  ECF No. 3, PageID.85.  Specifically, MDI contends "there is no way to learn and/or calculate its losses in monetary terms, given that there is no way to police or monitor the use and or disclose [*sic*] of its confidential information or the loss of customers that may be solicited."  *Id.* at PageID.86.

The Court agrees.  Ms. Shaw argues that MDI would be able to identify and calculate changes in the amount of business it does with each customer.  ECF No. 6, PageID.169.  While that is true, it would be difficult to determine how much of any change was due to Ms. Shaw, as opposed to market fluctuations, and that method would be entirely useless for determining Ms. Shaw's impact on potential customers. MDI is particularly vulnerable to "interference with [its] customer relationships" by Ms. Shaw under these circumstances because, as several witnesses testified, MDI and Miller Zell often work with, or compete for, the same clients.  *Certified Restoration Dry Cleaning*, 511 F.3d at 550.  The Court also notes that the Non-Competition Agreement states that "Employee also acknowledges that a violation of

17

the Agreement by Employee will result in immediate and irreparable injury to MDI and agrees that MDI shall be entitled to immediate injunctive relief, without the posting of a bond, to specifically enforce the terms of this Agreement." ECF No. 3-3, PageID.102. Thus, Ms. Shaw agreed that breach of the Non-Competition Agreement would constitute irreparable injury. *See, e.g.*, *Two Men & a Truck Int'l, Inc. v. Rupright*, No. 1:16-CV-23, 2016 WL 8808790, at *2 (W.D. Mich. Jan. 14, 2016) ("[Plaintiff] has also established irreparable harm on this record. By signing the franchise agreement, [defendant] agreed that a violation of the non-compete agreement would constitute irreparable harm.").

Ms. Shaw counters that MDI cannot show irreparable harm because (1) she is not selling the same products or services that she sold at MDI, (2) she does not possess MDI's trade secrets or other Confidential Information, (3) she has not contacted any of her former MDI customers for purposes of engaging in business, (4) she is not engaging or threatening to engage in business with any MDI customers, and (5) she has not shared or disclosed or threatened to share or disclose any MDI documents in her possession. ECF No. 6, PageID.168. These arguments are unavailing. The first, second, and fifth points fail for the reasons discussed in Section III.B.1.ii. *supra*. And the third and fourth points are not persuasive given

18

that Ms. Shaw admits that she has improperly retained MDI's customer information and has not returned it in the five months since she left MDI.

Accordingly, this factor weighs in favor of granting a preliminary injunction.

### 3. The balance of the equities favor MDI.

Third, the Court must balance the equities. *Winter*, 555 U.S. at 20. On the one hand, if the Court does not grant the preliminary injunction, it will impair MDI's reasonable business interests, and MDI will suffer irreparable harm as discussed extensively *supra*. On the other hand, Ms. Shaw testified that she is the sole breadwinner for her family and is also the family's source of healthcare insurance. As a result, if she loses her job, her family will be unable to pay their bills, including her son's college tuition.

"The Court acknowledges that enforcing the noncompete agreement will impose a hardship on [Ms. Shaw]; however, this fact is not dispositive." *Radio One, Inc. v. Wooten*, 452 F. Supp. 2d 754, 759 (E.D. Mich. 2006). Moreover, any harm caused to Ms. Shaw due to the loss of her job "is of [her] own making," because she took employment with a Competing Entity. *D.M. Rottermond Inc. v. Shiklanian*, No. 21-CV-10393, 2021 WL 1087422, at *2 (E.D. Mich. Mar. 22, 2021). At the evidentiary hearing, Plaintiff's expert witness Lesley Delgado, President of Strategic Recruiting Services LLC, testified that the current job market for sales professionals

19

favors employees and that someone with Ms. Shaw's experience and credentials would have little difficulty finding employment.  The Court finds Ms. Delgado's testimony particularly persuasive given her expertise and familiarity with the market for sales professionals.

Thus, the Court concludes the balance of the equities favor MDI, and this factor supports granting the preliminary injunction.

### 4. An injunction is in the public interest.

Finally, the Court must determine whether issuing an injunction is in the public interest.  *See Winter*, 555 U.S. at 20.  There is a general public interest in the enforcement of voluntarily assumed contractual obligations*.  Certified Restoration Dry Cleaning*, 511 F.3d at 551.  Indeed, "the public does not have an interest in individuals violating their contracts.  To the contrary, the public has an interest in the enforcement of valid employment contracts."  *Radio One*, 452 F. Supp. 2d at 760.  However, this must be balanced against Michigan's "public policy disfavoring restraints on trade and interference with a person's livelihood."  *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 848 (E.D. Mich. 1994), *appeal dismissed,* 48 F.3d 1219 (6th Cir. 1995).  Nevertheless, the Michigan Legislature has explicitly endorsed non-competition agreements where they are reasonable in scope.  MCL 445.774a(1).  Additionally, as discussed in detail in Section III.B.1.i. *supra*, contrary

20

to Ms. Shaw's assertions, the Non-Competition Agreement does not exceed MDI's legitimate competitive business interests.  ECF No. 6, PageID.171.

Thus, the Court finds that the public interest favors enforcing the Non-Competition Agreement, and this factor supports granting the preliminary injunction.

Accordingly, the Court finds that all four factors weigh in favor of granting the preliminary injunction and will grant MDI's Motion.

### 5.  Bond under Fed. R. Civ. P. 65(c)

The Sixth Circuit has held that "the district court possesses discretion over whether to require the posting of security."  *Moltan Co. v. Eagle–Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir.1995).  Here, the Non-Competition Agreement explicitly states that upon Ms. Shaw's breach of the Agreement, "MDI shall be entitled to immediate injunctive relief, *without the posting of a bond*, . . . ."  ECF No. 3-3, PageID.102 (emphasis added).  The Court must give the terms of the contract "their ordinary and plain meaning if such would be apparent to a reader of the instrument." *DeFrain v. State Farm Mut. Auto. Ins. Co.*, 491 Mich. 359, 367, 817 N.W.2d 504, 509 (2012) (citation and quotation marks omitted).  Additionally, the Court notes that MDI does not pose a collection risk should the Court later determine MDI is not

21

entitled to a permanent injunction.  Thus, given the strength of MDI's case, the Court will waive the security requirement in this matter.

### IV.   CONCLUSION

Accordingly, for the reasons articulated above, **IT IS HEREBY ORDERED** that MDI's Motion for Preliminary Injunction (ECF No. 3) is **GRANTED**.

**IT IS FURTHER ORDERED** that until such time as MDI's claim for permanent injunctive relief is heard and decided by this Court, Defendant Brianna Shaw is **ENJOINED**:

- From directly or indirectly competing with MDI, including but not limited to continuing employment with Miller Zell, or any other Competing Entity, for one full year, beginning with the date of the Court's order;

- From directly or indirectly, and in any manner, using or disclosing any Confidential Information belonging to or originating from MDI, including but not limited to using the Confidential Information to solicit or service MDI's existing or prospective customers; and

22

- From destroying, altering, modifying or concealing any documents, including but not limited to written or printed documents, data, email, and/or correspondence in any way relevant to this action, including but not limited to documents relating to MDI, Defendant's employment, and any of MDI's customers and potential customers.

**IT IS FURTHER ORDERED** that Defendant Brianna Shaw is **REQUIRED**:

- To immediately return all electronic data and documents that include, contain, or are in whole or in part derived from MDI's Confidential Information, including but not limited to the Confidential Information itself and all copies, summaries, compilations, and reiterations of that information, as well as any other MDI property in her possession or control; and

- To immediately make available for inspection and copying by MDI all computer hard drives that have had any of MDI's Confidential Information stored on them, or information derived from MDI's Confidential Information, as well as any and all email correspondence.

23

**IT IS SO ORDERED**.

/s/ Gershwin Drain

GERSHWIN A. DRAIN

UNITED STATES DISTRICT JUDGE

Dated:  December 9, 2022

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
December 9, 2022, by electronic and/or ordinary mail.

/s/ Teresa McGovern

Case Manager

24